**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

**BENTLEY WEST and**
**JERRY RAINEY,**

      **Plaintiffs,**

**v.**                                **CIVIL ACTION NO. 04-0100-KD-M**

**JACK TILLMAN, et al.,**

      **Defendants.**

<u>**ORDER**</u>

    This matter is before the Court on the motion of the defendants' Sheriff Jack Tillman,

James E. Owens, Ester L. Mitchell, Tiffany Davis, Bridgette S. Goode, and Linda V. Whitton,

for summary judgment on all claims alleged against them in plaintiffs' amended complaint.

(Doc. 71 and Attachments thereto), plaintiffs' brief in opposition (Docs. 73, 75), evidentiary

submissions in support thereof (Doc. 74) and defendants' reply brief (Doc. 76).   Defendants

move the Court for summary judgment on the basis of qualified immunity on the grounds that

plaintiffs have not demonstrated that any of the individual defendants were deliberately

indifferent to plaintiffs' rights.

I.    <u>Procedural History</u>

    Plaintiffs' initial complaint was filed on February 12, 2004.  (Doc. 1) On January 25,

2005, plaintiffs amended to join additional parties.  (Doc. 41)  Plaintiffs bring suit against Sheriff

Tillman in both his official capacity and in his individual capacity and against the following

other jail personnel in their individual capacity: (1) Bridgette Goode, Corrections Officer; (2)

Ronnie Phillips, Captain-Civil Division of the Sheriff's Department [1]; (3) James Owens, Deputy

Warden; (4) Lt. Ester Mitchell, Supervisor-Records Division Mobile County Metro Jail; (5)

Tiffany Davis, Records Specialist at the Jail (civilian employee of the Sheriff's Department); (6)

Linda Whitton, Records Specialist at the Jail (civilian employee of the Sheriff's Department), (7)

Laketa Wallace, Records Specialist at the Jail (civilian employee of the Sheriff's Department).

II.    <u>Factual Background</u> [2]

    This action arises out of the retention in custody, after the date set for release, of two

inmates at the Mobile Metro Jail. Plaintiff Bentley West ("West") was arrested on November 2,

2002, on a charge of first-degree possession of marijuana, and was held until December 27,

2002, despite a court order entered on December 4, 2002, that he be released on a signature

bond; West was thus held in the jail through Christmas, twenty-three (23) days after he was

ordered released on a signature bond. Plaintiff Jerry Rainey ("Rainey") was arrested on October

31, 2002, on a charge of first-degree robbery and was held until May 24, 2003. Despite the fact

that the Mobile County Grand Jury had no-billed his case on March 24, 2003, sixty-one (61)

days elapsed before Rainey was released from custody.

*Bentley West*

    Plaintiff West was arrested on a charge of possession of marijuana in the first degree on

November 2, 2002. He was unable to make the bond amount of $ 7,500 and remained

---

[1]  Captain Phillips also performed the duties of the Warden of the Mobile Metro Jail from approximately December 2001 through approximately March 2003.

[2]  The Court, when ruling on a motion for summary judgment, "must view all evidence and all factual inferences therefrom in the light most favorable to the non-moving party." <u>Miller v. King</u>, 384 F.3d 1248, 1258-59 (11th Cir.2004) (citations omitted). Accordingly, the factual background as stated herein is offered in the light most favorable to the plaintiffs.

incarcerated in the Mobile County Metro Jail.  West later appeared before District Judge Palughi who reduced the initial bond amount, and with the consent of the assistant district attorney, ordered that West be allowed to execute a signature bond on his own behalf.  Notwithstanding the court's order, the updated information was not included in the computer system and West remained incarcerated.  (Doc. 74, Affidavit of Bentley West)   In order for an inmate or detainee to be released from the jail after a bond hearing, the jail's Record Room had to act upon communications from the court system, which provided the jail bond reduction or release information. (Doc. 81, Agreed Facts)

According to the defendants, the initial failure to release plaintiff West occurred as a result of a clerical error by Records' Specialist Trainee Linda Whitton. [3]  Ms. Whitton was a relatively new hire at the time of Judge Palughi's order having worked approximately two weeks.  Part of her duties involved reviewing court orders and entering the pertinent information in the correct manner into the jail's computer system.  Judge Palughi's order was faxed to the jail and Whitton failed to take West's jail card to the docket department.  (Doc. 74, Exhibit 7, Deposition of Veberly Green at 19-20) [4]

------------------------------------------------------------

[3] Defendant concedes that they are unclear as to the reason West was not released on December 19th. Somewhere between the Records Department, the Docket Room and the cell housing West, the information did not make its way through.  (Doc. 71 at 20 )

[4] Veberly Green, a corporal in the Records Division at the Metro Jail stated that "[o]rders were received by Ms. [Linda V.] Whitt[o]n and Ms. [Tiffany] Davis. And from speaking to them, hearing conversations on it, when it happened two years ago, to the best of my knowledge was that Ms. Whitt[o]n entered an order and the – she did not realize that it needed – release on cause means she needed to take the jail card to Docket in order for him to be released. She was very new at the time, had only been there, in and out about two weeks. She was actually employed a couple of weeks earlier, left on vacation and came back. And in the process of her not knowing that, she didn't take the jail card around for him to be released in a timely manner."  (Doc. 74, Exhibit 7 at 19)

West made repeated inquiries about his release, attempting to explain the situation to various jail personnel. After Judge Palughi entered his order on December 4, 2002 allowing West to sign his own bond, plaintiff West waited in his cell for his release until approximately 4:00 p.m. At that time, he spoke with the correctional officer in his section, Ms. Stephens, who looked on the computer and did not see a notation that he was to be released on his own signature. (Doc. 74, Exhibit 1, West Affidavit)

Beginning the next day, West also made requests orally and in writing to various jail personnel, including written and oral requests to either Lt. Woods or Lt. Prince, and to "Ms. Goode." (Id.) A corrected mittimus for West was sent to the Jail on December 6, 2002, and, when the district court heard nothing from the jail, another copy was sent. At some point records department employee Tiffany Davis contacted the court for another copy of the order. When the copy of the order was received, defendants claim that defendant Davis entered the information in the computer– presumably correctly–but again did not take West's jail card to docketing, which resulted in Mr. West's continued detention. Defendant Davis was not new in her position and, as a result, was disciplined for her mistake in the West matter.

Plaintiff states that he spoke to C.O. Goode on December 27, 2002, and asked if she had received his prior requests; she responded that she had but had not had time to look into it.[5] C.O. Goode looked on the computer and informed defendant that he should have been released as of December 19, 2002. West was released the afternoon of December 27, 2002. West does not indicate when he had previously contacted C.O. Goode about the situation.

---

[5]Goode recalls only one contact with West and that was on December 27, 2002. Goode does not recall receiving any written communication from West.

4

On or about May 5, 2003, West notified Lieutenant Mitchell of his situation (which had occurred in December 2002).  (Doc. 81, Joint Pretrial Order, Agreed Facts) Thereafter, Lt. Mitchell directed Tiffany Davis, who was a Records Specialist at the time, to prepare a report. (Id)  The report reflects that Whitton entered a mittimus [6] with the bond amount of $2,500 and a return date of January 21, 2003.  (Doc. 74, Exhibit 9 at 14)  The report further reflects that on December 19, 2002, Corporal Goode contacted Davis regarding West being able to sign his own bond.  Davis was unable to locate the original order and contacted the district court to request that one be faxed. Id.  Upon receipt of the duplicate order, Davis' reports that she entered the information into the computer and sent West's jail card to Docket. (Id.)

*Jerry Rainey*

Plaintiff Rainey was incarcerated in the Mobile Metro Jail on October 31, 2002 on a charge of robbery in the first degree.  Rainey's case was no-billed by the grand jury on March 27, 2003.  (Doc. 81, Agreed Facts)  The order for Rainey's release was signed and faxed to the records section of the jail on March 27, 2003.   Someone in the Records Department, whom plaintiff alleges was either defendant Whitton or defendant Wallace, correctly entered the information into the computer but failed to take Rainey's jail card to the jail's docket department.  The docket department thus did not effectuate his release.  (Complaint)  From the time his case was bound over to the grand jury, plaintiff Rainey had occasionally asked officials at the jail about the status of the charges against him.   However, plaintiff offers no specific dates and does not identify any of the officers to whom he made those inquiries.  (Id.)  After one such

---

[6]  Mittimus (Latin for "we send") is a written court order directed to the keeper of a jail or prison, directing that he or she receive and safely keep an offender awaiting trial or sentence.

request, a correctional officer checked the computer and readily determined that plaintiff Rainey was due to be released.  (Id.)  Rainey was released from the Mobile County Metro Jail on May 24, 2003.  (Doc. 81, Agreed Facts)

Sheriff Tillman recalls no personal knowledge of the incidents involving West and Rainey.  (Doc. 71, Deposition of Sheriff Jack Tillman at 6-7) Sheriff Tillman has delegated responsibility for the Jail to a series of Wardens and others over the last several years.  Warden Rick Gadsden resigned in June 2000 and from that time until February 2001 the Metro Jail was without a Warden.  (Doc. 81, Agreed Facts)  During that time, the jail was controlled by former Chief Deputy James Mayo.  In 2001 Sheriff Tillman hired Steven Ellisor, but Warden Ellisor left after one year on the job.  Another Warden–unnamed in the submissions of the parties–was then hired, but he left the position after only a week, leaving the Jail without a Warden.  (Id.)  Captain Ronnie Phillips, who was in charge of the Civil Division of the Sheriff's Department, took over as Acting Warden of the Jail from December 2001 or January 2002 through approximately March 2003 in addition to his other duties.  In April 2003, Sheriff Tillman hired Michael Haley, who remains in the position of Warden of the Mobile Metro Jail.  (Id.)

It is undisputed that due to employee turnover, the jail has faced a continuing problem with staffing and it is further undisputed that the records department was understaffed at times.  During the relevant time periods, the staff in the records department worked overtime. (Doc. 81, Agreed Facts)  In addition, Corrections Officers familiar with the jail's computer system were brought into the records department to help out.  (Id.)  Defendants maintain, and it is not disputed, that during the relevant period, in response to the understaffing in the records department, the responsible persons hired additional records specialists.  While defendants

6

maintain that employees received on the job training, it is undisputed that there was no formal training in place for these new employees.

III.     Summary Judgment Standard

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).[7]  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden then shifts to the nonmovant to show the existence of a genuine issue of material fact.  Id.  "If the nonmoving party fails to makes 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof, 'the moving party is entitled to summary judgment."  Id. (quoting Celotex Corp., v. Catrett, 477 U.S. 317 (1986))(footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determination of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 999 (11th Cir. 1992) cert denied, 507 U.S. 911, 113 S.Ct. 1259, 122 L.Ed. 2d 657 (1993) (internal

---

[7]  Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment shall  be granted:

>  if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).

citations and quotations omitted).  However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Secretary of Dept. of Children and Family Services, 358 F.3d 804, 809 (11th Cir. 2004), cert denied, 534 U.S. 1081, 125 S.Ct. 869, 160 L.Ed.2d 825 (2005).

With this legal framework in mind, the Court now turns to the defendants' specific grounds in support of the motion for summary judgment.

IV.    Analysis

Plaintiffs West and Rainey allege various constitutional violations against the defendants pursuant to 42 U.S.C. § 1983 ("Section 1983)  Actions in federal court to address and remedy a violation of the Constitution by a state actor are brought through Section 1983 which provides that:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

42 U.S.C. § 1983.   In order  "[t]o sustain a cause of action based on section 1983, [a plaintiff] must establish two elements: (1) that [he] suffered a deprivation of rights, privileges or immunities secured by the Constitution and laws of the United States, and (2) that the act or omission causing the deprivation was committed by a person acting under color of law." Wideman v. Shallowford Community Hosp., Inc., 826 F.2d 1030, 1032 (11th Cir.1987) (internal quotations and citation omitted).

A.   *Official Capacity/Sovereign immunity*

Plaintiffs allege constitutional violations against Sheriff Tillman in his official capacity as Sheriff of Mobile County.  As a threshold matter, Sheriff Tillman is a state actor for purposes of Section 1983.  See, e.g., Turquitt v. Jefferson County, Alabama, 137 F.3d 1285, 1288 (11th Cir.), cert. denied, 525 U.S. 874, 119 S.Ct. 174, 142 L.Ed.2d 142 (1998)("...an Alabama sheriff acts exclusively for the state rather than for the county in operating a county jail."); Marsh v. Butler County, Alabama, 268 F.3d 1014, 1028 ("the sheriff has control over the inmates in the jail, the employees of the jail, and the jail itself")(quoting Turquitt, 137 F.3d at 1289, and citing Ala.Code § 14-6-1)  By definition, only "persons" may be sued for a constitutional deprivation under section 1983.  See 42 U.S.C. § 1983.  Further, it is settled law that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983" with regard to claims for damages.  Will v. Michigan Dept. of State Police,  491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989)(citing 42 U.S.C. § 1983).  In their official capacity, Alabama Sheriffs operating jails are state officers protected by Eleventh Amendment immunity.  Taylor v. Adams, 221 F 3d 1254 (11th Cir. 2000); see also Harbert International, Inc. v. James, 157 F.3d 1271, 1277 (11th Cir. 1998)("The state need not be formally named as a defendant for the [Eleventh] amendment to apply; state officials sued in their official capacity are also protected by the amendment." )  However, § 1983 contemplates, and the Eleventh Amendment does not foreclose, an action against a state official in his official capacity where the plaintiff seeks only prospective, injunctive relief.  Cross v. State of Alabama, State Department of Mental Health, 49 F.3d 1490 (11th Cir. 1995).  Specifically, Eleventh Amendment sovereign immunity does not apply to bar relief when a state official is sued for prospective injunctive relief to "end a

continuing violation of federal law."  See Seminole Tribe of Florida, 517 U.S. 44, 73, 116 S.Ct. 1114, 1132 ( 1996) (quoting Green v. Mansour, 474 U.S. 64, 68, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1986)); Ex parte Young, 209 U.S. 123, 155-56, 28 S.Ct. 441, 452, 52 L.Ed. 714 (1908)(a suit for injunctive relief provides a narrow, but well-established, exception to Eleventh Amendment immunity). Therefore, to the extent that defendant Tillman is sued in his official capacity for damages, defendant's motion for summary judgment is **GRANTED**.   Plaintiffs' claims for injunctive and declaratory relief against defendant Tillman are discussed below.

      B.     *Individual Capacity/Qualified Immunity*

Defendants further move for summary judgment on plaintiffs' individual capacity claims on the ground of qualified immunity.  (Doc. 71 at 5)  Under the doctrine of qualified immunity "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).   Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271(1986).

To assess the qualified immunity defense, the Court must first examine whether the defendants can establish that they were performing discretionary functions.  "[I]n order to receive qualified immunity, the public actor must prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."  Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir.2004); see also  Harris v. Coweta County, Ga., 433 F.3d 807, 811 (11th Cir.2005).  The defendant bears the burden of establishing

that his actions fell within the parameters of his discretionary authority. The failure to satisfy this burden negates the qualified immunity defense.  See  Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir.2004) (explaining that if defendants cannot show that they were engaged in a discretionary function, they are ineligible for qualified immunity).  In determining whether an individual was performing a "discretionary function" the Court's inquiry focuses on  "whether the government employee was (a) pursuing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." Id. at 1265.

If it is established that the individual was performing a "discretionary function", the Court must next address the following "threshold question" to determine whether the defendants are entitled to qualified immunity:  "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendants'] conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156(2001).  If not then "there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." Id.; see also  Siegert v. Gilley, 500 U.S. 226, 232, 111 S. Ct. 1789, 1793, 114 L. Ed. 2d 277 (1991) ("A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all").

"[A] showing of deliberate indifference [to the constitutional right] is required to establish a violation of substantive due process rights protected by the fourteenth amendment". Id.  "Deliberate indifference is not the same thing as negligence or carelessness. On the

11

contrary, the Supreme Court has made clear that a state official acts with deliberate indifference only when he disregards a risk of harm of which he is actually aware." Ray v. Foltz, 370 F.3d 1079, 1083 (11th Cir. 2004) (citing Farmer v. Brennan, 511 U.S. 825, 836, 114 S.Ct. 1970, 1978 (1994); Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976)).  In Farmer, the Supreme Court expressly "reject[ed] ⋯ an objective test for deliberate indifference." Farmer, 511 U.S. at 837, 114 S.Ct. at 1979.  To be deliberately indifferent, an "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837, 114 S.Ct. at 1979.  Thus, in order to establish deliberate indifference the plaintiff must be able to establish that the defendant (1) had a subjective knowledge of a risk of serious harm; and (2) disregarded that risk, (3) by conduct that is more than mere negligence.  Cagle v. Sutherland, 334 F.3d 980, 987 (11th Cir. 2003); see also  Board of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("[D]eliberate  indifference is a stringent standard of fault, requiring proof that [an] actor disregarded a known or obvious consequence of his action.")

The Court now turns to plaintiffs' specific allegations against the defendants.

1.    West's Claims Against Records Specialists Whitton & Davis [8]

Plaintiff West alleges claims against the Whitton, Davis and Wallace under 42 U.S.C. Section 1983 for false imprisonment rising to the level of a liberty deprivation in violation of the due process clause of the Fourteenth Amendment. (Complaint)

---

[8] Davis was promoted to the Records Supervisor in the Metro Jail. At the time that plaintiffs West and Rainey were detained, she was a Records Specialist and her name was Tiffany Moses. She worked as a Records Specialist in 1999 through 2000, was transferred to the Docket Room and then came back to work in the Records Department in 2001.  Defendant Linda Whitton was a civilian employee in the Records' Department of the Mobile County Metro Jail.

A Section 1983 false imprisonment claim must meet the elements of a common law false imprisonment "and establish that the imprisonment worked a violation of the Fourteenth Amendment due process rights." Cannon v. Macon County, 1 F.3d 1558, 1562-63 (11th Cir. 1993), modified,15 F.3d 1022 (1994), citing Douthit v. Jones, 619 F.2d 527, 532 (5th Cir.1980) [9]. The standards of a substantive due process claim requires a showing that the correctional officer acted with deliberate indifference to the arrestee's due process rights. Id.  The Eleventh Circuit, as well as other circuits, has recognized the constitutional right to be free from continued detention after the state knew or should have known that the detainee was entitled to release. Cannon at 1563; Rivas v. Freeman, 940 F.2d 1491 (11th Cir. 1991); Sivard v. Pulaski County, 959 F.2d 662 (7th Cir. 1992); Sanders v. English, 950 F.2d 1152 (5th Cir. 1992).

Defendants' do not contend that plaintiffs' rights, to be released when the legal authority for their detention had expired, were not clearly established nor that a reasonable corrections officer would not have known of any applicable legal duties.  Rather, defendants assert that the delay in releasing West was due to 'human error' and that each of the allegedly erring individuals is entitled to the protection of qualified immunity because there is no evidence from which a reasonable jury could find that the defendants acted with 'deliberate indifference.' (Doc. 71 at 12-14)

It is undisputed that jail procedures require that the inmate's jail card be taken from the records office to the docket office in order to comply with a court order for the release of that

---

[9]  Decisions of the former Fifth Circuit rendered prior to October 1, 1981, are binding precedent on the Eleventh Circuit. Bonner v. City of Prichard, Alabama, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

inmate, and that it was the duty of the employee who entered the information in the system to pull the card and to take it physically to that office. (Doc. 74, Exhibit 7).  Plaintiff alleges that Whitton was deliberately indifferent when she initially failed to take plaintiff's jail card to the appropriate office after she received the Judge's order which allowed West to sign his own bond. (Complaint) Thereafter, plaintiff maintains that defendant Davis was deliberately indifferent when she failed to take the plaintiff's jail card to the same office upon receipt of one or two replacement copies of that order, which were obtained for the purpose of correcting the prior error. (Id.)

*Discretionary Function*

As previously stated, to be entitled to qualified immunity, an officer must have been exercising a 'discretionary function.'  Plaintiff briefly argues, relying on inapplicable case law [10], that Davis, Whitton and Wallace were not acting pursuant to discretionary authority when they failed to transport West's jail card from one location to another.  Specifically, plaintiffs argue that the defendants were performing ministerial functions and are therefor not entitled to qualified immunity.  (Doc. 75, p. 10)

Qualified immunity is available to a government official–even if his actions appear to be ministerial in nature–so long as the official's actions "'(1) were undertaken pursuant to the performance of his duties,' and '(2) were within the scope of his authority.'" Jordan v. Doe, 38

---

[10]  One of the cases cited by plaintiffs in support focuses on the issue of judicial immunity.  See Bayou LaBatre v. Robinson, 785 So.2d 1128, 1134 (Ala.2000).  In Bayou La Batre, the Alabama Supreme Court, in addressing the issue of judicial immunity, held that the magistrate was performing an administrative duty that did not involve the exercise of judgment when she faxed a warrant-recall order to the police department upside down so that the police department received a blank page (the back page of the warrant).  785 So.2d at 1133.

F.3d 1559, 1566 (11th Cir.1994).  In that case, the panel rejected a proposed dichotomy between 'ministerial' and 'discretionary' acts and the argument that a ministerial act could not be discretionary.  Id.; also see Holloman, 370 F.3d at 1265 ("[i]n the qualified immunity context, ⋯ we appear to have abandoned this 'discretionary  function/ministerial task' dichotomy ⋯⋯ [F]or purposes of qualified immunity, a governmental actor engaged in purely ministerial activities can nevertheless be performing a discretionary  function.")

It is undisputed that the three records specialists were engaged in activities within the performance of their duties, (i.e. keying in court orders to the Metro Jail computer system), and that their actions were clearly within the scope of their authority.   The Court finds plaintiffs' argument that Whitton, Davis and Wallace were not performing a discretionary function is without merit and that defendants have, in fact, established that that they were performing a discretionary function.  Accordingly, the Court next turns to the issue of whether plaintiff has alleged an actionable constitutional violation against these defendants.

*Constitutional Violation*

With regard to defendant Linda Whitton, the evidence reflects that she failed to properly enter all the information contained on the mittimus involving West.   While Whitton apparently did enter the reduction of West's bond, the information relating to the Judge's order that West could sign his own bond was not included.  Defendant maintains at the time of this incident, Ms. Whitton was a trainee and there is no evidence that she intentionally failed to enter this information in the computer or that she was deliberately indifferent about the ramifications. Defendant maintains that the failure, at most, is only a negligent omission on her part and does not rise to the level of a constitutional violation.

15

With respect to defendant Whitton, the Court finds that there is insufficient evidence from which a jury could find that her failure to transport the jail card was more than mere negligence.  It is well settled that negligence alone will not support a claim of liability under §1983.  See  Davidson v. Cannon, 474 U.S. 344, 347(1986).  The plaintiff's evidence merely shows that Whitton was a new employee and that she did not follow through on paperwork which resulted in West's extended detention.  There is no evidence from which a jury could reasonably infer that this was done with deliberate indifference to the plaintiff's constitutional right to be released.  Accordingly, defendant Whitton's motion for summary judgment as to all claims alleged against her by plaintiff West is **GRANTED.**

The Court now turns to West's allegations against defendant Tiffany [Moses] Davis. Davis maintains that when she was informed of an error involving West she investigated the situation, requested a new mittimus from the Mobile County District Court and entered that information into the Jail computer.  (Doc. 74, Exhibit 17, Moses Narrative)   Defendant maintains that whatever Davis' role in West's continued incarceration from December 19th until December 27th, it was not intentional and blames the omission on human error.  Accordingly, defendant argues that Davis was not deliberately indifferent to Bentley West, and as such she is entitled to qualified immunity.

Unlike defendant Whitton, defendant Davis was an experienced employee in the records department and there is no dispute that she had the requisite subjective knowledge of the importance of the order and the appropriate way to handle the order for West's release. Moreover, based on her own testimony Davis was well aware of the risk of injury to plaintiff West if she should fail to take his jail card to the appropriate office.  (Doc. 74, Deposition of

Tiffany Davis) Thus, Davis had subjective knowledge of the risk for serious harm.  However, there is simply no evidence before the Court that Davis was deliberately indifferent to that risk. Although the plaintiffs have offered evidence of other incidents involving over-detained inmates, they have not tied any of these specifically to Davis.  The plaintiff's evidence, at best, establishes only negligence on Davis' part, which is insufficient to trigger a Section 1983 violation.  See Rivas v. Freeman, 940 F.2d at 1495("The negligent act of an official causing unintended loss or injury to life, liberty or property does not implicate due process rights under 42 U.S.C. § 1983."); see also  Bucher v. Michaels, 1993 WL 410040, at *4 (E.D.Pa., Oct. 6, 1993) (dispatcher's mistake of transmitting incorrect birth date was only negligent).  Accordingly, Davis' motion for summary judgment as to the claims alleged against her by plaintiff West is **GRANTED.**

    2.    West's Claims Against Corrections Officer Goode [11]

    Plaintiff alleges that Corporal Goode, a corrections officer during the times relevant to this litigation, was deliberately indifferent to West's constitutional rights by failing to timely investigate his claims that he had been ordered released on his own recognizance on December 4, 2005.  In support, West offers his own testimony that he had made one or more written requests to various individuals including Goode at some point before December 27, 2002, and that she failed to investigate those claims until he spoke with her in person on December 27, 2002.  (Doc.74, Affidavit of Bentley West).  West avers that Goode acknowledged to him that

---

[11]  In response to plaintiffs' brief in opposition to the motion for summary judgment defendant argues that the brief fails to reference Corrections Officer Bridgette S. Goode and that Officer Goode's motion for summary judgment is due to be granted. (Doc. 76 at 7) However, while the court agrees that plaintiffs' fails to make any argument in their opposition brief as to Goode, plaintiffs' argument regarding the claims against Goode are included in their "Findings of Fact and Conclusions of Law" filed separately.  (Doc. 73)

she had received his prior requests but had not had time to look into it but would look into the matter in the next thirty minutes.  (Id.)

Defendant argues that Goode was not assigned as one of the guards over the cell where West was located. (Doc. 71 at 22) Rather, she was assigned as the Court Officer to oversee the movement of inmates from the jail to the Court and back.  (Id)  On occasion, inmates would ask her to check on things for them, since many inmates knew her from their previous stays. Defendants acknowledge that West asked Goode to check on his status and maintain that she did just that - -by calling the Records Department.[12]   Defendant argues, however, that it was not her duty to follow-up on West's status, since she had reported the matter to the appropriate jail employees.  (Id. at 22-23)  Defendant further maintains that when West again contacted Goode, Goode did in fact, again contact the Records' Department and West was released that day. Based on this, defendant's argue there is no evidence that Goode was deliberately indifferent to West's situation. (Id.)

Plaintiff's claim is based on Goode's alleged failure to have *previously* followed up on West's prior requests.  The evidence of such prior requests, however, is minimal.  Although West maintains that he previously contacted Goode he offers no specific details about his prior communications with Goode, including the dates of such communications.[13]  The only other

---

[12]  Goode acknowledges speaking with West on December 27, 2002, regarding his incarceration; however, she does not recall any written communications from him or speaking with him prior to December 27, 2002.  (Doc. 74, Exhibit 6, Deposition of Bridgette S. Goode, pp. 41, 58-59).  However, her factual position on summary judgment is supported by Davis' report that she was contacted by Goode regarding West on December 19, 2002.

[13]  West states that he "began" to send written requests to jail personnel on December 5, and lists Ms. Goode as one of several persons to whom he sent such a request.  (Doc. 74, Affidavit of Bentley West at 2)

information in the record that lends any support to plaintiff is Davis' report that Goode contacted her on December 19, 2002 to inquire about West.  This inquiry led to West's computer entry being corrected.  Thus, the evidence, at best, is that Goode inquired about West with the appropriate department on December 19, 2002, and then did not follow-up.  The Court finds that plaintiff West has failed to provide sufficient evidence to withstand summary judgment that Goode's actions constitute deliberate indifference to West's constitutional rights.  Accordingly, defendant Goode's motion for summary judgment as to all claims alleged against her by plaintiff West is **GRANTED.**

      3.    <u>Rainey's Claims Against Records Specialists Davis, Whitton & Wallace</u>

Rainey alleges that he was subjected to over-detention at the Metro Jail when someone in the records department failed to properly handle the order for his release entered when the grand jury 'no-billed' the charges against him.  Although the order was entered on the jail's computer system, Rainey's jail card was not delivered to the docket department.  Rainey alleges that *either* defendant Whitton or defendant Wallace was responsible for entering the information in the no bill report and for taking the inmates' jail cards to the Docket section.  Veberly Green testified that she *thought* Laketa Wallace was responsible for failing to deliver the Rainey card but that as supervisor she took responsibility for the mistake.  (Doc. 74, Exhibit 7, Deposition of Veberly Green)  Defendants assert only that defendant Whitton was not the responsible party and there is no evidence to indicate otherwise.  (Doc. 74) [14]

Plaintiff is unable to identify which defendant allegedly failed to take the jail card to the docket section.  There is no evidence to link defendant Whitton to the incident.  Moreover,

---

[14]  As noted herein, Wallace is proceeding *pro se* and is not joined in the instant motion for summary judgment.

other than Green's statement that she "thought" Wallace made the error, there is also no

evidence to support her assumption.  Accordingly, defendant Whitton's motion for summary

judgment as to all claims alleged against her by plaintiff Rainey is **GRANTED.**[15]

        4.      <u>Rainey's Claims Against Corrections Officers</u>

It is not clear whether plaintiff Rainey has made a claim against any official for failing to

check his status after the initial mishandling of the no-bill report.  To the extent, if any, that

plaintiff Rainey has made a claim against a Corrections Officer or other jail employee based on

their failure to adequately investigate his status despite his verbal requests, he has failed to offer

sufficient evidence of such a failure by any specific defendant to support such a claim.  Rainey

fails to identify any specific requests made after the date the no-bill report was sent to the Jail,

and has not identified a particular official to whom he had made such a request.  There is no

basis in the record for individual liability for such a failure.

        C.      *Supervisory Liability* [16]

---

[15]As to defendant Davis, Rainey fails to make any allegations in his complaint against
Davis and further fails to make any argument in his opposition brief that she is responsible in her
individual capacity for Rainey's over-detention. There is no evidence that she was aware of the
situation involving Rainey either at the time or subsequently. As such she is entitled to judgment
in her favor as to Rainey's claims against her as there is no evidence that she violated Rainey's
Constitutional Rights.


[16]     In  <u>Greason v. Kemp,</u> 891 F.2d 829 (11th Cir.1990) the Eleventh Circuit Court of
Appeals opined, in part:

     We recently applied <u>City of Canton</u> in  <u>Kerr v. City of West Palm Beach</u>, 875
     F.2d 1546, 1555-57 (11th Cir.1989). Although we are not here concerned with
     municipal  liability, the analysis used in those cases is applicable to the case at
     hand, in which we must determine whether quasi-policymakers have been
     deliberately indifferent in their supervision of subordinates.  Thus, as we explore
     the supervisors' conduct in this case, we will borrow from the Court's analysis in
     <u>City of Canton</u>  and our analysis in <u>Kerr</u>  to help determine whether the

Plaintiffs Rainey and West also raise claims against Lt. Ester Mitchell, supervisor of the Records Department; James Owens, Deputy Warden; Captain Ronnie Phillips[17], head of the Civil Division of the Sheriff's Department and who also filled in as Acting Warden of the Jail from December 2001 through approximately March 2003; and Sheriff Jack Tillman in their supervisory capacities. [18]   Specifically, plaintiffs allege that Sheriff Tillman, Deputy Warden Owens, Capt. Phillips and Lt. Mitchell are responsible for the delayed release of plaintiffs in that defendants failed to properly staff the jail and failed to properly train and supervise jail employees.  (Doc. 75 at 13) Plaintiffs further allege that this failure to train/supervise is a "policy or custom" giving rise to Section 1983 liability.  Plaintiffs contend that the supervisors, including Sheriff Tillman were aware of the need for training as a result of a history of prior similar incidents of overdetention.  (Doc. 75 at 30) Additionally, plaintiffs contend that the records division of the jail was grossly understaffed which created a likelihood of problems such as those encountered by West and Rainey.  (Id. at 30)

Liability of supervisory officials under §1983 cannot be predicated on vicarious liability

_____

supervisors  were deliberately indifferent to Greason's eighth amendment rights.

891 F.2d at 837.

[17]   Phillips has not filed a motion for summary judgment.

[18]   A suit under § 1983 against an officer in his official capacity is "another way of pleading an action against an entity of which an officer is an agent." Kentucky v. Graham, 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). Defendants argue that since West and Rainey have sued Defendants individually under §1983, and not alleged that these individual Defendants conspired together to violate their Constitutional Rights, the claims against the Defendants should be treated separately and individually. Stavropoulos v. Firestone, 361 F. 3d 610, 620 n. 9 (11th Cir. 2004).  The Court concurs and has conducted its analysis accordingly.

or respondeat superior.  Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir.1999).  Rather,

supervisory officials can only be liable if they personally participate in the alleged constitutional

violation or where there is a "causal connection between actions of the supervising official and

the alleged constitutional deprivation." Id. (quoting Brown v. Crawford, 906 F.2d 667, 671

(11th Cir.1990)).   A causal connection may be established when: 1) a "history of widespread

abuse" puts the responsible supervisor on notice of the need to correct the alleged deprivation,

and he or she fails to do so; 2) a supervisor's custom or policy results in deliberate indifference to

constitutional rights; or 3) facts support an inference that the supervisor directed subordinates to

act unlawfully or knew that subordinates would act unlawfully and failed to stop them from

doing so.  Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003).

> The "widespread abuse" requirement contemplates that constitutional violations must

"occur with frequency," such as where "rights are systematically violated on a near-daily basis"

via a "repeated pattern of unconstitutional behavior."  Holloman v. Harland, 370 F.3d at 1294.

> In Hartley, the Eleventh Circuit Court of Appeals opined, in part, as follows:

> The causal connection can be established when a history of widespread abuse puts
> the responsible supervisor on notice of the need to correct the alleged deprivation,
> and he fails to do so. The deprivations that constitute widespread abuse sufficient
> to notify the supervising official must be obvious, flagrant, rampant and
> continued duration, rather than isolated occurrences. In addition, the causal
> connection may be established and supervisory liability imposed where the
> supervisor's improper custom or policy ... result[s] in deliberate indifference to
> constitutional rights.

193 F.3d at 1269 (internal quotations and citations omitted); Cooper v. Dillon, 403 F.3d 1208,

1221 (11th Cir.2005) (for purposes of § 1983 supervisory liability, a "custom is a practice that is

so settled and permanent that it takes on the force of law").

> Knowledge imputed to the supervisor "must be so pervasive that the refusal to prevent

harm rises to the level of a custom or policy of depriving inmates of their constitutional rights."
Tittle v. Jefferson County Comm'n, 10 F.3d 1535, 1542 (11th Cir.1994). The failure to act or
implement policy must be in the face of repeated violations or other indicators signifying a
strong likelihood that the situation will recur. See  Harris v. City of Marion, 79 F.3d 56, 58-59
(7th Cir.1996).

Supervisors are generally entitled to rely on their subordinates to respond appropriately
to situations absent clear or widespread evidence to the contrary.  Thus, "[t]he standard by which
a supervisor is held liable in [his] individual capacity for the actions of a subordinate is
extremely rigorous." Cottone, 326 F.3d at 1360 (quoting Gonzalez v. Reno, 325 F.3d 1228, 1234
(11th Cir.2003)); Brown v. Crawford, 906 F.2d at 671( "deprivations that constitute widespread
abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of
continued duration, rather than isolated occurrences").

In alleging a 1983 violation based on a policy, such as in this case understaffing,
plaintiffs may not  rely on a generalized policy of understaffing. McDowell v. Brown, 392 F.3d
1283, 1291 (11th Cir. 2004)   Thus, in the present case, plaintiffs must show not only that the
records department was understaffed and the supervisors knew, but they must also show that the
supervisors were deliberately indifferent to whether understaffing would result in constitutional
violations.

In McDowell  the plaintiff brought suit against DeKalb County under section 1983
arguing "that DeKalb County's custom of understaffing the Sheriff's Office (and the Jail) delayed
the treatment of his condition" and thereby violated his rights under the Eighth Amendment.  The
Eleventh Circuit found that Mr. McDowell had failed to establish that the county's policy,

practice or custom resulted in the violation of his Eighth Amendment rights, as required by
Monell v. Dept. of Soc. Servs., 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). [19]  The
Court concluded that the County's decision that "would make a violation of [plaintiff's]
constitutional rights 'more likely,' is insufficient to 'give rise to an inference that a policy
maker's failure to scrutinize the [budget] ⋯ produced a specific constitutional  allegation.' " 392
F.3d at 1292 (citing Brown, 520 U.S. at 411, 117 S.Ct. 1382 (emphasis in original)). Rather, the
court found that "the County's liability cannot be dependent on the scant likelihood that its
budget decisions would trickle down the administrative facets and deprive a person of his
constitutional rights. Instead, liability must be premised on a finding that this budget decision
was highly likely to inflict the particular injury." Id.   The Court further concluded that
McDowell could not rely on a generalized policy of understaffing to show that the municipality's
action was "taken with the requisite degree of culpability ⋯ with deliberate indifference to its
known or obvious consequences." Id. citing  Anderson v. City of Atlanta, 778 F.2d 678, 687-88
(11th Cir.1985).  In addressing the causation issue, the Court noted that plaintiff must "prove
causation by demonstrating that the municipality's " deliberate conduct ⋯ was the 'moving
force' behind [his] injury⋯⋯" McDowell at 1292 (citing Brown, 520 U.S. at 404, 117 S.Ct. 1382
(emphasis in the original)).

     *1.    Understaffing/Failure to Supervise*

---

[19]  Government officials' treatment of pretrial detainees is governed by the Due Process
Clause of the Fourteenth Amendment, while treatment of convicted prisoners is governed by the
Eighth Amendment. See Lancaster v. Monroe County, Ala., 116 F.3d 1419, 1425 n. 6 (11th
Cir.1997). The appropriate legal standards are the same under both amendments; therefore,
Eighth and Fourteenth Amendment cases can be used interchangeably in the "deliberate
indifference" analysis. See id.;  Cottone v. Jenne, 326 F.3d at 1356, n. 4 (11th  Cir.2003) ("the
standard for providing basic human needs to those incarcerated or in detention is the same under
both the Eighth and Fourteenth Amendments") (citation omitted).

Plaintiffs maintain that supervisors at the Metro Jail, up to and including Sheriff Tillman, were aware of the serious understaffing at the jail and were aware that errors would likely result as a result of the personnel shortage. (Doc. 73 at 35) In support, plaintiffs offer the testimony of Veberly Green, a corporal in the Records Division at the Metro Jail.  (Doc. 74, Exhibit 7, Deposition of Veberly Green)  Green maintains that the employees were severely overworked and the jail was under staffed and that she complained to supervisors about the understaffing problem.[20]  (Id. at 59) Green's assessment of the staffing problems at the jail is mirrored by defendants Whitton, Wallace and Davis who each expressed dissatisfaction with the workload, overtime and stress level at the jail due to understaffing.  (Doc. 74, Exhibits 14, 17, 18 )[21]

In support of their claims alleging a lack of supervision, plaintiffs first point to other instances (occurring after the West incident and involving defendant Whitton) wherein individuals were detained past their court ordered release. (Doc. 74, Exhibit 18, Deposition of Linda Whitton at pp. 45; 48-50; 57-61; 71-73)   Specifically, in Whitton's deposition she identified the following as having been detained past their release date:   (a) Clifford Armstrong - remained in jail over weekend because release paperwork was not processed on Friday; (b) Milton Jackson - one day delay in release because incorrect information was entered on the computer; (c)  Eppie Farris - jail card was not taken to the docket room resulting in one or two day overstay; (d) Richard Wade - jail card not taken to the docket room; (e) Timothy Hayes- two day delay in release because paperwork not timely completed, and (f) Travis Alexander -

---

[20]  Green acknowledges that she did not complain to Sheriff Tillman.

[21] Green characterized the situation in the records division as a  "train wreck waiting to happen".  Whitton described the fatigue, stress, illness that all resulted from the overwork and Wallace left  before her probationary period was up because "the job was so stressful."

one day delay in release due to failure of information to be entered in computer.  Plaintiff also

alleges an incident involving inmate Parks, but fails to include the referenced transcript page 62

of Whitton's deposition, which allegedly describes the incident.   The evidence regarding these

incidents indicate that the mistakes were discovered by supervisors and Whitton was "written

up" for the errors.  (Id. at 42-45)

Plaintiffs next point to evidence of over detention occurring prior to that of West and

Rainey.  Plaintiff alleges, but submits no evidence, that in February 2000 inmate Samuel David

Dixon was over-detained for 13 days due to a failure to enter the bond reduction on the

computer.[22]  Plaintiffs contend that  Sheriff Tillman was made personally aware of this case

because he was sued over the incident.  (Doc. 75 at 25-26) [23]  Plaintiffs also submit the affidavit

of Rebecca Ludlam, head of the District Court Criminal Division.  (Doc. 74, Exhibit 1 at 10-12)

Ms. Ludlum's affidavit chronicles years of efforts by the Courts to send over mitimus and other

bond information to the Record Room.  (Id.) Ludlum notes the ongoing and consistent failures of

the Record Room to process this information and as a result a consistent number of inmates

being forced to stay in the jail beyond the court ordered term. Id.  Plaintiffs states that Ludlam

---

[22]  Plaintiff also references inmate James Carpenter who died during his detention at the
jail. However there does not appear to be any evidence that the Carpenter detention was
overextended.  Plaintiffs reference Exh. E,F,G which were not included because of their size.
Plaintiffs indicated "not scanned due to voluminous size. Available from plaintiffs' counsel."
(Doc. 74-1).  The Court does not bear the responsibility of locating or requesting the relevant
information and is certainly not duty bound to sift  through voluminous filings in an effort to
locate evidence in support of a parties' position. Waldridge v. American Hoechst Corp., 24 F.3d
918, 920 (7th Cir.1994); see Local Rule 7.2  (The non-moving party "shall point out the disputed
facts appropriately referenced to the supporting document or documents *filed in the action*.
Failure to do so will be considered an admission that no material factual dispute exists....")

[23]  The Dixon incident occurred almost three years before the West detention.

contends that twice a month an inmate was kept in jail after their release date.  However, the affidavit submitted by plaintiffs does not include that statement as it appears page 3 is missing.  Moreover, it is unclear what time period the Ludlum affidavit is referencing.  Because the evidence is incomplete and because the Court is unable to discern the time frame to which the affiant refers, the evidentiary value of the affidavit is limited.

Plaintiffs also submit the affidavit of Jamie Keith Godsey , a former corrections officer at the Metro Jail.  (Doc. 74, Exhibit 1 at 20-22)  Godsey recalled that inmate Jimmy Sawyer told him he should be released and he called to check and then inmate was released.  However, the affidavit provides no other details regarding the incident including the length of the alleged over detention or the cause of the delay.  Godsey further avers that other inmates told him on a few occasions that they were held longer than required.  Again, as with the Ludlum affidavit, there are no specifics provided and no evidence that the inmates' statements were true.

Plaintiffs also submit the affidavit of Edna Nicholson wherein she avers that at some point *before* she left her employ with the Metro Jail in June of 2000 the computer system crashed for over a month and they lost everything.  (Doc. 74, Exhibit 1 at 13-16) [24] Nicholson states that the system failure caused delays which resulted in over detention of some of the inmates.  Nicholson avers that sometimes there were 10 complaints a month from inmate's families who thought that the inmate should be released or bond reduced.  However, plaintiffs offer no

---

[24]  Plaintiff also points to the deposition of Lt. Nina Wood wherein she noted problems with the jail computer system from July through November 1999.  Likewise, Sgt. Stallworth remembered that the computer system went down in December 1999 and everything had to be done by hand.  While this evidence may reflect the state of the jail in 1999, this does not reflect the conditions at the jail during the time period made the basis of this litigation.  Moreover, defendant has submitted uncontroverted evidence that increased staffing and computer upgrades were made beginning in 2001.

evidence that any of these complaints were legitimate.[25]  Moreover, even if they were legitimate

complaints, there is no evidence they were similar to the incidents regarding plaintiffs.  Rather,

according to Nicholson's affidavit the incidents were a result of the computer failure.

　　　In their reply brief defendants do not address the affidavits individually but rather accuse

plaintiffs generally of engaging in "sound bite jurisprudence."  (Doc. 76) Defendants argue that

the bulk of plaintiffs' evidence pertains to time periods occurring in 1999 and 2000 prior to the

changes that occurred in 2001, which included hiring additional staff and upgrading the

computer system.  (Doc. 76 at 3-4) While defendants do not dispute that the jail staff was

reduced in mid 2002, they  maintain that employees from other divisions within the jail were

brought in to assist and the record room employees consistently worked overtime to process

inmates in an effort to compensate for the reduced staff.  Moreover, defendants contend that by

end of 2002 and the beginning of 2003, when the incidents made the basis of this litigation

occurred,  new staff was being hired.  (Doc. 76 at 6)  Ronnie Phillips testified that he worked to

get more staff in 2002-2003 because he saw the need.  (Doc. 71, Deposition of Ronnie Phillips,

Exhibit 8 at 32; 37-38)    Phillips recalls hiring approximately seventy-five new employees prior

---

[25]  In Brooks v. Scheib, 813 F.2d 1191 (11th  Cir.1987), even though there had been ten
citizen complaints about police officer Scheib, the Eleventh Circuit Court of Appeals held that
the City did not have any notice of past police misconduct because the plaintiff "never
demonstrated that past complaints of police misconduct had any merit." Id. at 1193. The Court
noted that "the number of complaints bears no relation to their validity." Id.  Similarly, in the
present case, plaintiffs present affidavits of former jail employees who maintain, in sum, that
they received complaints  from family members advising that their relative was being over
detained.  (Doc. 74, Exhibits thereto) However, there is no evidence that those complaints had
merit.

to his retirement in the spring of 2003.  (Id. at 32) [26]

> a.    *Sheriff Tillman*

Plaintiffs first maintain that Sheriff Tillman was on notice of the problems at the Metro

Jail as a result of the prior litigation involving James Carpenter and Samuel David Dixon[27], the

large employee turnover and attendant problems created by understaffing.  Plaintiffs point to

audits, internal investigations, the grand Jury reports, the budget information and the information

provided by or known to Deputy Warden Owens, Cpt. Phillips, Chief Deputy Mayo, Chief

Barbour and personnel Director Bettis.  (Doc. 73)  Plaintiffs contend that if Sheriff Tillman was

unaware of this information, it reflects a command structure in such disarray that Sheriff Tillman

was deliberately indifferent to all forms of problems and issues under this command.  (Id.)

Defendants argue that the command structure at the jail is such that the Sheriff has little

control over the day to day activities and that due to the sheer volume of individuals processed

---

[26]  Plaintiffs agree to the following description of hiring practices for the Mobile County
Metro Jail as outlined in Defendants' Finding of Facts and Conclusions of Law:

> In order to fill a position at the Mobile County Metro Jail, there first must be an
> opening.  Then, the Mobile County Personnel Board will submit a list of eligible
> applicants.  Some times they are required to perform testing before they can
> submit this list.  Even after the list is submitted, the background checks and other
> things may eliminate some of the applicants.  If the individual's name is not on
> the list submitted by the Mobile County Personnel Board, then they cannot be
> hired.

(Doc. 71 at ¶13)

[27]  Carpenter died while in detention at the Mobile Metro Jail.  There is no allegation of
over detention relating to that case.  David Dixon was over detained for a period of
approximately two weeks in 2000.

each year through the Mobile County Metro Jail, human error is unavoidable. [28]  Although

defendants concede that some mistakes are inevitable, they maintain that plaintiffs have failed to

show any evidence of any wide-spread abuse which would have placed Sheriff Tillman on notice

that Constitutional violations were likely to occur.  (Doc. 71)

In his deposition, Sheriff Tillman noted that during his tenure as sheriff the jail

population increased dramatically, creating a steady influx of paperwork.[29]  (Doc. 74, Deposition

of Sheriff Tillman, Exhibit 16 at 18-20) While Tillman stated that he was personally unaware of

problems involving overdetention of inmates, he did acknowledge an awareness of a problem

with "paperwork flow" which he characterized as stemming from the failure of the courts to get

the information to the jail.  (Id. at 11; 23) Tillman recited efforts by his office to improve the

system of obtaining information from the courts, including upgrading the jail computer system to

interface with the court's system.  (Id.)

While the plaintiffs' evidence is sufficient to establish that Tillman was aware of

problems at the jail, it is not sufficient to establish that he was aware of and ignored any

---

[28]  Defendants note that at the time that Tillman became Sheriff, court documents were
handled almost exclusively by hand.

[29]  Sheriff Tillman maintains that the Metro Jail processes "anywhere from five to 12,000
[documents] a month, sometimes two or three thousand a week."  (Doc. 71, Tillman Dep., at 15)
Sheriff Tillman further testified :

> [W]e could book as many as 4,000 people a month. ...And then all of those turn
> into, obviously, cases, most of them, either in district court or circuit court which
> is just a constant nightmare of paperwork flow that we don't actually initiate
> because it comes from the court system back to us.

(Id.)  Tillman noted that the jail was attempting to upgrade its computer system "trying to get
them out of circuit court to go to some kind of computer system either coming from the judge's
desk or the circuit clerk's desk where it would automatically go on the computer and
automatically transfer to our system."  (Id. at 17)

widespread abuse which resulted in plaintiffs' over-detention.  There is also no evidence that the issue of understaffing or supervision was ignored.  As discussed above, the supervisors attempted to address the issue of understaffing by overtime, temporary help and ultimately hiring new employees.  Also the evidence shows that most of the over-detention mistakes were addressed by supervisors through counseling.   While these attempts may not have been adequate to completely solve the problem, they are adequate to refute any reasonable contention by plaintiffs that Sheriff Tillman was deliberately indifferent to the constitutional rights of inmates not to be over-detained.

       b.    *James Owens*

Plaintiffs further argue that defendant Owens was on notice of the problems at the jail as he was placed in charge of the day to day operations.  (Doc. 73 at 28) During the time relevant to this litigation Owens was over administration, training, applicants, jail budgets, personnel files, interview testing and jail budgets.  (Doc. 74, Exhibit 10, Owens Dep. At 15-16)

Owens conceded that the records room "never had enough people" and was understaffed at the time he left in April 2003.  (Doc. 74, Exhibit 11 at  7-11) [30]  Owens noted that there was always overtime in the records department which led him to believe there was "too much [work] for the number of people they had in there to do it, to keep up with, so they had to work overtime."  (Id. at 31)  Owens complained to Charlie Pettis and Lt. Mitchell regarding the need for more staffing in the records room.  (Id. at 33, 41)  While he acknowledges the staffing problems in the Records Division, Owens states that he "could count on one hand the number of

---

[30]  Captain Ronnie Phillips testified that when Warden Haley came on board in April 2003, four months after West's bond was reduced, and one month after Rainey's charges were no-billed, the jail was fully staffed. (Doc. 71, Deposition of Ronald Phillips, Exhibit 11)

people that has been [sic] kept in jail longer than they should have been over [his] period of eighteen years [at the Metro Jail].  (Doc. 74, Exhibit 10 at 38)

The evidence is sufficient that Owens was well aware of the problems of understaffing in the records department.  However, as with Tillman, the plaintiffs have failed to submit sufficient evidence from which a reasonable jury could find that Owens was deliberately indifferent to the situation or that the understaffing resulted in the type of widespread abuse necessary to impose liability under Section 1983.

          c.   *Ester Mitchell*

Plaintiffs identify Ester Mitchell as a supervisor of the records division and generically assert that she failed to properly staff and supervise the records department.  Mitchell testified that she was a Corrections Lieutenant in 2002-2003 but that her duties included "supervising-overseeing [ ] the records department, the money clerk's office."  (Doc. 74, Exhibit 8 at 8)

In her deposition, Mitchell notes several instances where inmates advised her they were scheduled to be released and she followed up on the requests.  In response to plaintiffs' counsel's questions regarding prior instances of over-detention, Mitchell stated:

> There have been incidents to where inmates have been incarcerated and they'll advise us they've gone to court today and they should be released and then when we notify records with what they're saying and then they will check the information and let us know whether or not they've received it from the courts. And in most cases I will follow up.  If not, I will have the next shift to check on it and make sure to tell them what the inmate has passed on to me and follow up on that.  And in most case, they are - they are normally telling the truth, the ones that I've dealt with.
>
>                ...
>
> And then some of them would have misunderstood the judge.  Well, we would call the courts...and then they would say, well, no, he has to serve the sentence. He may have received a split sentence or something and didn't really interpret

32

what the judge had ordered.

(Doc. 74, Deposition of Ester Mitchell, Exhibit 8 at 21-23)

During her eighteen year tenure with the Sheriff's Office Mitchell could only recall issues of over-detention arising two or three times a year.  (Id. at 24) Mitchell learned of the incident involving West after the fact and counseled Davis regarding the error.  (Doc. 74, Exhibit 8 at 47-49) After learning of West's over-detention, Mitchell met with employees in the records division and apprised them of the situation and "[a]fter that we met on several occasions in references to, [ ] the importance of double-checking the paperwork.  And then I met with Corporal Green and Ms. Moses [Davis] in reference to double-checking then because they were brand new."  (Id. at 48-50)  While Mitchell was aware of the staffing problems at the jail and the issues involving over-detention, the evidence is undisputed that she responded to the mistakes by additional on the job training and counseling.  There is simply not sufficient evidence from which a reasonable jury could find that she ignored the problem or was deliberately indifferent to the rights of inmates not to be over-detained.

In sum, plaintiffs have presented some evidence of other incidents of over-detention in the years preceding and following those involving West and Rainey. [31] (Doc. 74,  Exhibit 1 ) However, the record also reflects that these problems were not ignored by supervisory personnel, especially not during the relevant time frame.  Specifically, employees were moved from other divisions within the jail into the records division to assist with the workload.  In addition, there is evidence that the employees worked additional hours in an effort to process all the inmates in a timely fashion.  The record further reflects that new employees were hired beginning in 2001.

_____

[31]  As noted previously however, some of that evidence predates 2001 when defendants began hiring new employees and upgraded the computer systems.

Although the incidents involving West and Rainey do not appear to have been isolated events, the evidence does not reflect that these errors were widespread or flagrant .  Moreover, much of the evidence submitted by plaintiff fails to indicate the time frame or relates to the period of time prior to 2001 when the evidence reflects that changes were being implemented at the jail. While the Court acknowledges that facts of the instant case present a stronger scenario than those faced by the court in <u>McDowell</u>, given the admonition by the Supreme Court in <u>Brown</u>,("[D]eliberate  indifference is a stringent standard of fault, requiring proof that [an] actor disregarded a known or obvious consequence of his action."), the Court concludes that the defendants' actions do not rise to the level of deliberate indifference such that liability under Section 1983 could attach.  Accordingly, the Court finds there is no genuine issue of material fact as to plaintiffs' allegations based on understaffing and supervision.  Accordingly, defendants' motion for summary judgment as to plaintiffs' claims against Tillman, Owens and Mitchell alleging deliberate indifference based on understaffing and failure to supervise, is **GRANTED.**

       2.     *Failure to Train* [32]

Plaintiffs next contend that the command structure at the jail was in disarray and that training was nonexistent.  Plaintiffs maintain that the Sheriff and/or his agents were well aware of the need for training at the jail and the lack thereof.  Plaintiffs point to two investigation reports, one by a retained consultant and one by the jail's own internal affairs investigator, which they maintain provide evidence that the sheriff's department had a policy, practice or custom of

---

[32]  Defendants concede that "[w]hile Plaintiffs may have raised a genuine issue concerning training of corrections officers, the training of corrections officers is not material to this case."  (Doc. 76 at 17)

failing to properly train its employees and properly maintain the jail. [33]

In response, defendants maintain that additional training would not have prevented the type of human error that occurred with both Rainey and West. (Doc. 76 at 17-18) Defendants again point to the voluminous nature of the records that are processed through the jail. Defendants contend that no amount of training could erase the possibility of human error when dealing with such an influx of paperwork.

The Supreme Court has recognized that inadequate training may impose § 1983 liability on a municipality in 'limited circumstances. See City of Canton v. Harris, 489 U.S. 378, 389-91, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). The Supreme Court has instructed that these 'limited circumstances' occur only where the municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights." Gold v. City of Miami, 151 F.3d 1346, 1351 (11th Cir.1998)(citing City of Canton v. Harris, 489 U.S. at 389-91.

Where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants such a shortcoming can be properly thought of as a city 'policy or custom' that is actionable under § 1983. City of Canton, 489 U.S. at 389. In City of Canton, the Supreme Court explained that a plaintiff may prove a city policy by showing that the municipality's failure to train evidenced a "deliberate indifference" to the rights of its inhabitants, as follows:

---

[33] The Voorhis Report, was the result of an audit ordered by Sheriff Tillman into the operations of the jail that described massive overcrowding and understaffing. The other report, was an Internal Affairs investigation conducted by a Sgt. Dru Ryals into the death of James Carpenter who died while incarcerated. There is no allegation that Carpenter was over detained. Moreover, while plaintiffs reference this report in their brief, it was not filed with the Court.

We hold today that the inadequacy of police training may serve as the basis for §
1983 liability only where the failure to train amounts to deliberate indifference to
the rights of persons with whom the police come into contact. ..."[M]unicipal
liability under § 1983 attaches where-and only where-a deliberate choice to
follow a course of action is made from among various alternatives" by city
policymakers. Only where a failure to train reflects a "deliberate" or "conscious"
choice by a municipality-a "policy" as defined by our prior cases-can a city be
liable for such a failure under § 1983.

489 U.S. at 388-89, 109 S.Ct. 1197 (internal citations omitted). [34]

Thus, in order to establish a §1983 claim for failure to train, plaintiffs must prove that:

(1) defendants knew of a need to train in a particular area, (2) made a deliberate choice not to do

so, and (3) this failure to train constitutes a custom or policy , which was the moving force

behind the deprivation of Plaintiff's constitutional rights. See  Noell v. White, 2005 WL 2581611

(M.D. Fla. 2005); see also  Gold v. City of Miami, 151 F.3d at 1351(stating that a municipality

cannot be held liable for a failure to train unless it was on notice of a need to train in a particular

area).  Moreover, evidence that a policy or procedure was not followed by an employee is

insufficient to establish liability against the supervisory official.  McCurry v. Moore, 242 F.

Supp. 2d 1167, 1177 (N.D. Fla. 2002).

---

[34]  In City of Canton, the Supreme Court noted that this high standard of proof is
intentionally onerous for plaintiffs in an effort to avoid subjecting the municipality to respondeat
superior liability.  The Court opined, in part:

[t]o adopt lesser standards of fault and causation would open municipalities to
unprecedented liability under § 1983. In virtually every instance where a person
has had his or her constitutional rights violated by a city employee, a § 1983
plaintiff will be able to point to something the city "could have done" to prevent
the unfortunate incident. Thus, permitting cases against cities for their "failure to
train" employees to go forward under § 1983 on a lesser standard of fault would
result in de facto respondeat superior liability on municipalities····

Id. at 391-92, 109 S.Ct. 1197 (citations omitted)

36

a.    *Sheriff Tillman*

Plaintiffs argue that there was no policy in place regarding properly processing inmate release paperwork or, if there was a policy, the employees were not properly trained regarding the procedure.  In support plaintiffs offer Bridgette Goode's testimony that the jail had no Standard Operating Procedure ("SOP") on the form necessary for inmates to seek release from the jail.  Plaintiffs' also offer the fact that Whitton was unable to identify what defendants purported to be policies on the release of inmates.  Plaintiffs argue that Sheriff Tillman is directly liable for his policy, custom or practice of failing to properly train his employees regarding release procedure.

Defendants argue, in sum,  that Sheriff Tillman  "is given a monumental task of managing the jail as well as providing law enforcement services and delivering Court documents" and there is no evidence to show that he was deliberately indifferent to the Constitutional Rights of West or Rainey by deliberately not training his employees. (Doc. 71 at 14)

There is no evidence that the training received by the workers in the Records' Department was inadequate regarding the proper procedure for the release of an inmate.  The evidence, as discussed fully *supra* shows at best that the employees negligently failed to follow proper procedures. "[E]vidence that a policy or procedure was not followed by an employee is insufficient to establish liability against the supervisory official."  McCurry, 242 F.Supp2d at 1177.  While it appears that the record specialists did not receive *formal* training, Officers Green, Davis, Whitton and Wallace all testified that they were provided on the job training. (Doc. 76 at 16)  Their positions did not require complex technical knowledge or skills.  Their jobs duties,

37

relevant to this litigation, consisted of taking a piece of paper from a fax machine and entering certain information into a computer and then delivering a jail card to the docket room. Although there appear to have been problems during Sheriff Tillman's tenure, the Court finds that the evidence before it is insufficient for a reasonable jury to conclude that Sheriff Tillman was deliberately indifferent to the Constitutional Rights of West or Rainey by deliberately failing to properly train his employees in the proper procedure for processing inmate release papers.

       *b.*    *Ester Mitchell* [35]

Plaintiffs allege that Lieutenant Esther Mitchell was the supervisor of the records section at the relevant times and was immediately responsible for training and supervising the employees in the records section. As such, plaintiffs claim that she should be held individually liable because she did not sufficiently train the employees.

There is no evidence before the Court that Lt. Mitchell had knowledge of the incidents involving West and Rainey until several months after the fact when it was brought to her attention by plaintiff West. (Doc. 81, Agreed Facts) Once apprised of the incident, Mitchell directed Tiffany Moses Davis to prepare a written report. (Doc. 81, Agreed Facts) As a result of the report, Mitchell reprimanded Davis for her actions involving West. (Doc. 74, Exhibit 8 at 47-49) Finally, Mitchell stated in her deposition that after learning of West's overdetention, she met with employees in the records division and apprised them of the situation and "[a]fter that we met on several occasions in references to, [ ] the importance of double-checking the paperwork. And then I met with Corporal Green and Ms. Moses [Davis] in reference to double-

_____

[35] Plaintiffs' response to the motion for summary judgment grouped a number of defendants under the category of "supervisory defendants" without specifically delineating to the Court what each individual defendant did or failed to do regarding the alleged Constitutional violations.

checking then because they were brand new."  (Doc. 74, Exhibit 8 at 48-50)

The evidence reflects that once apprised of the overdetention of West, Mitchell counseled the record room employees and reiterated the necessity of verifying paperwork.  There is no evidence that the duties of the job required more training than was provided by on the job training, nor is the evidence sufficient for a reasonable jury to find that any lack of training was the moving force behind the deprivation of plaintiffs' constitutional rights.

        c.     *Owens*

James Owens was the Deputy Warden at all relevant times.  Plaintiffs' allege that Owens is liable as a supervisor in charge of training because he failed to train jail employees properly when he knew of the systemic failures of the record room.  In support plaintiffs point to testimony that there was a general lack of training throughout the jail, that Owens was aware of this and that he was aware of incidents of over-detention due to mistakes by record room employees.   Plaintiffs have failed, however, to present any evidence that the over-detentions were causally related to the failure to provide additional training to record room employees.  The nature of the work in the record room (i.e., entering data into the computer and transferring the jail card to docketing) was such that on the job training would appear to be sufficient.  Plaintiffs have failed to show otherwise.

In the final analysis, plaintiffs have not shown that the supervisory defendants were deliberately indifferent to either West or Rainey's rights.  The facts of this case, as addressed herein, would not support a determination that there was a policy, custom or widespread practice resulting in deliberate indifference to plaintiffs West and Rainey's constitutional rights, as is necessary to create the requisite causal connection between the supervisory personnel and the

plaintiffs' alleged constitutional deprivation.  Accordingly, defendants' motion for summary judgment on plaintiff's allegations of failure to train is **GRANTED.**

V.      Conclusion

      Based on the foregoing, defendants' motion for summary judgment as to all claims alleged in plaintiffs' complaint is **GRANTED.**

      **DONE** this the 21st day of July 2006.


                    s/ Kristi K. DuBose
                    **KRISTI K. DuBOSE**
                    **UNITED STATES DISTRICT JUDGE**

40